920 F.2d 1402
 55 Empl. Prac. Dec. P 40,415
 Daniel CRAIN; George Buckner, III, Appellants,
v.
BOARD OF POLICE COMMISSIONERS OF the METROPOLITAN POLICE
DEPARTMENT OF the CITY OF ST. LOUIS; Robert J.
Bauer; John J. Frank; James E.
Mosbacher; William H. Young, Appellees.
 No. 89-2101.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 12, 1990.
Decided Dec. 12, 1990.
Rehearing and Rehearing En Banc
Denied Feb. 11, 1991.
 
 Ross H. Briggs, St. Louis, Mo., for appellants.
 Phillip I. Morse of Danis, Boyce & Morse, St. Louis, Mo., for appellees.
 Before JOHN R. GIBSON and BOWMAN, Circuit Judges, and HENLEY, Senior Circuit Judge.
 BOWMAN, Circuit Judge.
 
 
 1
 Daniel Crain and George Buckner III, a former and present police officer respectively, brought this action for injunctive and declaratory relief under 42 U.S.C. Sec. 1983 (1982) against the Board of Police Commissioners of the Metropolitan Police Department of the City of St. Louis and certain police commissioners in their official capacities only (hereinafter referred to collectively as "Police Board"). Crain and Buckner allege that certain provisions of the sick leave regulations of the St. Louis Police Department are unconstitutional. In addition, Crain sues for damages and equitable relief, including reinstatement to the police force, on the grounds that his discharge from employment for violating the sick leave regulations infringed on his rights under the First and Fourteenth Amendments to the United States Constitution. The District Court[1] entered summary judgment in favor of the Police Board on all three counts.[2] We affirm.I.
 
 
 2
 Crain and Buckner argue that the sick leave regulations at issue, which prohibit an officer on sick leave from leaving his residence except to obtain medical treatment or attention, impinge on a variety of constitutional rights, including their rights to free exercise of religion, to vote, to travel, and to freely associate. Crain, who was discharged for violating the sick leave regulations, further claims that his discharge was in retaliation for his filing a grievance concerning the sick leave regulations, in violation of his First Amendment rights, and that the procedure used by the Police Board in discharging him violated his right to due process under the Fourteenth Amendment. Before proceeding to the merits of these claims, we address the standing and mootness issues raised by the Police Board in its motion for summary judgment.[3]
 
 
 3
 In its motion for summary judgment, the Police Board argued that Crain did not have standing to challenge the sick leave regulations because his discharge on February 14, 1986, could not be traced to the sick leave policy since Crain also was fired for an entirely separate violation of police regulations--absenting himself from duty without leave. The Police Board further argued that because Crain was fired on the same date for a violation of police regulations that were totally separate from the sick leave policy, his claims alleging retaliation and a denial of due process regarding his discharge were moot. According to the record, Crain was charged with two separate violations of police regulations: leaving his residence while on sick leave for purposes other than obtaining medical treatment and absenting himself from duty without leave. On September 12, 1985, Crain was afforded separate and individual evidentiary hearings on each of the two charges. Following the hearings, the Hearing Officer prepared two separate Recommended Findings of Fact and Conclusions of Law, finding Crain guilty of both violations. The decision as to what punishment was appropriate for the infractions, however, was made in a single Police Board meeting held on February 14, 1986.
 
 
 4
 The District Court addressed the issue of Crain's standing in its order granting summary judgment and found Crain had standing because he suffered direct injury as a result of an application of the challenged sick leave regulations. Implicit in the District Court's conclusion is the finding that, although each individual violation with which Crain was charged was punishable with discharge, Crain was ultimately discharged as a result of the combined infractions. This finding is not clearly erroneous as both violations were before the Board when it decided Crain's fate and it is reasonable that both would be taken into account in its decision. We therefore conclude, as did the District Court, that Crain has standing to challenge the sick leave regulations and his claims regarding his discharge are not moot. We now turn to the merits raised in this appeal, addressing first the constitutionality of the sick leave regulations and then Crain's individual claims.
 
 II.
 
 5
 We review a decision to grant a motion for summary judgment de novo and will affirm only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." United Tel. Co. v. Johnson Publishing Co., 855 F.2d 604, 607 (8th Cir.1988) (quoting Fed.R.Civ.P. 56(c)). Where, as here, the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate. Lomar Wholesale Grocery v. Dieter's Gourmet Foods, 824 F.2d 582, 585 (8th Cir.1987), cert. denied, 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988). We note that both parties moved for summary judgment below and appellants do not argue that the issue before this Court involves anything other than a legal determination as to the constitutionality of the challenged sick leave regulations.
 
 
 6
 The full text of the regulations at issue, Police Manual Rule 7.011(m) and Special Order 71-S-1, is set out in the margin.[4] The regulations prohibit an officer on sick leave from leaving his residence except to obtain medical treatment or attention or for therapeutic exercise at the direction of his physician and with the prior approval of the office of the Chief of Police.[5] Officers who are on sick leave continue to be paid their full salaries.
 
 
 7
 We first address the question of what standard of review should be applied in analyzing these regulations. Appellants assert that, because the regulations infringe on their constitutional rights to free exercise of religion, to vote, to travel, and to freely associate with others, the Police Board must articulate a compelling state interest in order to justify the restrictions. The Police Board argues that the rational relationship standard applies and that the regulations are rationally related to the department's interests in public safety and department morale. We conclude that the Police Department's sick leave regulations must be reviewed deferentially and that appellants must show that the regulations bear no rational relationship to a legitimate state interest.
 
 
 8
 Several courts have considered whether similar sick leave policies implemented by public employers are unconstitutional, and all but one have concluded that regulations of this type do not violate the constitutional rights of police officers or other public employees. See Hambsch v. Department of Treasury, 796 F.2d 430, 434 (Fed.Cir.1986) (regulations which prohibit secret service agents on sick leave from leaving the Washington D.C. metropolitan area are rationally related to "Service's interest in fostering public safety by contributing to the efficient operations of the Service" and are not an unconstitutional violation of agents' right to travel); Korenyi v. Department of Sanitation, 699 F.Supp. 388 (E.D.N.Y.1988) (analyzing each constitutional right separately, court found that sick leave regulations did not unconstitutionally infringe on sanitation workers' rights to travel, consult with counsel, associate freely, vote, and freely exercise their religion); Voorhees v. Shull, 686 F.Supp. 389, 394-95 (E.D.N.Y.1987) (standard of review "depends not on the nature of right involved, but on the character of the challenger;" rational relationship standard is appropriate when challenger is municipal employee and restrictive sick leave regulations are rationally related to police department's interest in public safety and efficiency); Serge v. City of Scranton, 610 F.Supp. 1086 (M.D.Pa.1985) (rational relationship standard is proper standard for reviewing sick leave regulations when plaintiff is not average citizen but employee of the police force; case remanded for more detailed pleadings); Philadelphia Lodge No. 5, Fraternal Order of Police v. City of Philadelphia, 599 F.Supp. 254 (E.D.Pa.1984) (rational relationship standard used to judge regulations promulgated by city as employer; sick leave regulations that restrict police officers' and firefighters' rights to vote, travel, privacy, and free exercise of religion are rationally related to city's interest in providing sufficient staffing, reducing costs, and improving morale), aff'd sub nom., Local 22, Int'l Ass'n of Firefighters v. City of Philadelphia, 779 F.2d 43 (3rd Cir.1985); Loughran v. Codd, 432 F.Supp. 259 (E.D.N.Y.1976) (because plaintiff is employee of New York City Police Department and not ordinary citizen, proper standard of review is rational relationship test and sick leave regulations are unquestionably rationally related to city's interest in efficiently managing the department and preventing abuses). But see Pienta v. Village of Schaumburg, 710 F.2d 1258 (7th Cir.1983) (applying strict scrutiny to regulations which impact on rights protected by specific provisions of the Bill of Rights and finding that the city did not articulate a compelling interest to justify the police department's sick leave regulations). With the exception of Pienta, courts reviewing these policies have recognized the broad deference that must be accorded a municipality charged with the efficient management of its departments, and have been mindful of the need to prevent abuses of liberal sick leave policies wherein absent employees continue to be paid with taxpayer money.
 
 
 9
 While it has never considered a sick leave policy such as the one at issue here, the Supreme Court has distinguished between the standard of review to be applied when laws limiting constitutional rights are challenged by an ordinary citizen and when they are challenged by an employee of a city's police department. Kelley v. Johnson, 425 U.S. 238, 244-45, 96 S.Ct. 1440, 1444, 47 L.Ed.2d 708 (1976). In Kelley, a police officer argued that the department's grooming regulations violated his Fourteenth Amendment right to control his personal appearance. The Court assumed without deciding that there is a liberty interest in personal appearance protected by the Fourteenth Amendment, but went on to hold that the hair length regulation did not violate that right. Because "[r]espondent has sought the protection of the Fourteenth Amendment, not as a member of the citizenry at large, but on the contrary as an employee of the police department of Suffolk County, a subdivision of the State of New York," 425 U.S. at 244-45, 96 S.Ct. at 1444, the hair length regulation must be viewed in the context of the nature of a policeman's job, the need for discipline, and the wide latitude traditionally accorded to local governments in the governing of their internal affairs. 425 U.S. at 247, 96 S.Ct. at 1445. Due to this "highly significant" distinction in respondent's status as a police officer rather than an ordinary citizen, the Court held that he must "demonstrate that there is no rational connection between the regulation" and the promotion of public safety. 425 U.S. at 245, 247, 96 S.Ct. at 1444, 1446.[6]
 
 
 10
 Appellants urge this Court to adopt the reasoning of the Seventh Circuit's decision in Pienta where the court held that when a public employee's claim "is grounded solely in the general liberty language of the due process clause ... the state need only demonstrate a rational relationship between the regulation and a legitimate state interest," but when his claim "challenges limitations on rights specifically protected by other parts of the Constitution, the state must demonstrate that the regulation is necessitated by a compelling state interest and is narrowly tailored to meet that objective." Pienta, 710 F.2d at 1260. Because the sick leave regulations limit rights guaranteed by the Bill of Rights, appellants argue that this Court must give the regulations strict scrutiny and require the Police Board to articulate a compelling state interest justifying the sick leave policy. Appellants attempt to distinguish Kelley, as did the court in Pienta, as involving a challenge to a regulation that "implicate[d] only the more general contours of the substantive liberty interest protected by the Fourteenth Amendment." Kelley, 425 U.S. at 245, 96 S.Ct. at 1444. Unlike the court in Pienta, however, we do not read Kelley as applicable only to challenges based on general liberty interests, and we decline to follow the approach taken in Pienta.
 
 
 11
 There is ample support for Kelley's status-oriented approach. Regulations limiting even those rights guaranteed by the explicit language of the Bill of Rights are reviewed more deferentially when applied to certain public employees than when applied to ordinary citizens. See United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers, 413 U.S. 548, 567, 93 S.Ct. 2880, 2891, 37 L.Ed.2d 796 (1973) (holding that "[n]either the right to associate nor the right to participate in political activities is absolute," and Congress may prohibit federal employees from participating in political activities in view of its interest in maintaining a nonpartisan work force); Pickering v. Board of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968) (while state employment may not be conditioned on the relinquishment of First Amendment rights, "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general"); Reeder v. Kansas City Bd. of Police Comm'rs, 733 F.2d 543, 547 (8th Cir.1984) (Kansas City Police Department may prohibit its officers from making political campaign contributions; "public employees receive certain benefits and undertake certain duties" and "[o]ne of those duties may require the surrender of rights that would otherwise be beyond the reach of governmental power"); Otten v. Schicker, 655 F.2d 142, 144 (8th Cir.1981) (St. Louis Police Department regulation prohibiting officers from running for public office does not violate officer's First Amendment rights of free speech and association as the regulation serves important state interests of "ensuring impartial execution of the laws" and attracting qualified applicants by providing job security free from political influences).
 
 
 12
 Finally, this Court previously has held that the rational relationship standard is the proper standard for review of police regulations. Vorbeck v. Schnicker, 660 F.2d 1260, 1266 (8th Cir.1981), cert. denied, 455 U.S. 921, 102 S.Ct. 1278, 71 L.Ed.2d 462 (1982). In Vorbeck, police officers challenged certain personnel regulations governing standards of conduct as being vague and overbroad and as violating their constitutional rights. While we held that the officers' claim was not ripe for judicial resolution, we made it clear that when reviewing police regulations such as the ones challenged we would require the officers to "demonstrate that there is no rational connection between the regulation, based as it is on the county's method of organizing its police force, and the promotion of safety of persons and property." 660 F.2d at 1266 (quoting Kelley, 425 U.S. at 247, 96 S.Ct. at 1446). Our conclusion was based on the understanding that "[a] state may demand of its police officers a more exacting standard of conduct than it could validly impose by criminal statute on citizens in general." 660 F.2d at 1267 (Arnold, J., concurring).
 
 
 13
 Our review of Vorbeck and the other cases discussed above convinces us that here the governing standard of review is the rational relationship standard. We therefore review the challenged sick leave regulations to determine whether "there is no rational connection between the regulation[s]" and the St. Louis Police Department's legitimate interests in public safety and department morale. Kelley, 425 U.S. at 247, 96 S.Ct. at 1446.
 
 
 14
 Appellants argue that the sick leave regulations are unconstitutional even under rational basis scrutiny because "[t]he draconian reach of defendants' sick leave policy" serves to make it irrational. Appellants' Brief at 18. The Police Board counters that the restrictive sick leave policy is necessary and serves the interests of safety and morale by expediting the recovery of sick officers, minimizing the burden on officers who may have to work longer hours while other officers are out sick, and assuring that officers on sick leave are not malingering and that the sick leave policy is not abused. The legitimacy of the Police Board's interests is obvious. "[A] police department has a substantial interest in developing 'discipline, esprit de corps, and uniformity' within its ranks so as to insure the safety of persons and property." Hughes v. Whitmer, 714 F.2d 1407, 1419 (8th Cir.1983) (quoting Kelley, 425 U.S. at 246, 96 S.Ct. at 1445), cert. denied, 465 U.S. 1023, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984). The police department, as a paramilitary organization, must be given considerably more latitude in its decisions regarding discipline and personnel regulations than the ordinary government employer. See 714 F.2d at 1419. Importantly, the restrictions that appellants complain of are not restrictions of their rights at all times, but rather are limitations placed on their activities only when officers represent that they are too ill to report to duty. While acknowledging that the St. Louis Police Department's sick leave regulations are stringent, we have no difficulty finding that they are rationally connected to the legitimate interests the department has articulated.
 
 
 15
 The practical restrictions on appellants' right to freely associate and to travel are minimal and rationally related to legitimate public interests. Appellants do not complain of any infringement of their right to associate for purposes of expression as protected by the First Amendment, but rather claim that the regulations unduly limit their personal relationships with family and friends. See Roberts v. United States Jaycees, 468 U.S. 609, 617-19, 104 S.Ct. 3244, 3249-50, 82 L.Ed.2d 462 (1984) (discussion of varying degrees of constitutional protection accorded to different types of claims alleging infringement of right to associate). The sick leave regulations in no way limit appellants as to whom they may associate with in their homes when ill. Neither do the regulations restrict the frequency or duration of the visits appellants may have in their homes with family and friends while on sick leave. The prohibition on outside-the-home visits to family and friends while on sick leave is entirely reasonable and not unduly restrictive. Similarly, it is unquestionably rational for the St. Louis Police Department to limit appellants' ability to travel when on sick leave.
 
 
 16
 The sick leave regulations do not violate appellants' rights to freely exercise their religion or to vote. The cases that have struck down state limitations on religion have been those "[w]here the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." Hobbie v. Unemployment Appeals Comm'n of Fla., 480 U.S. 136, 141, 107 S.Ct. 1046, 1049, 94 L.Ed.2d 190 (1987) (quoting Thomas v. Review Bd. of Ind. Employment Sec. Div., 450 U.S. 707, 717-18, 101 S.Ct. 1425, 1431-32, 67 L.Ed.2d 624 (1981)) (emphasis omitted). The regulations in the instant case do not burden any one religion over another and do not limit an officer's ability to observe any religious rite he chooses so long as the observance is conducted in his home. Finally, we believe it is within a police department's broad discretionary power to determine that an officer who is too ill to report for his scheduled duties on an election day is too ill to leave his home to vote. An officer suffering from a long-term illness or injury who is confined to a hospital or his home may vote by way of an absentee ballot. An officer stricken on an election day with a sudden illness serious enough to prevent him from reporting for his scheduled duty will simply have to forego casting his ballot in that election, as we are sure do thousands of other voters who fall ill on an election day.
 
 
 17
 We are not persuaded by appellants' argument that an officer with an injury such as a broken arm who cannot perform his duties as a police officer but who does not need to remain at home for recuperative reasons will be confined to his home for weeks at a time. Under Police Manual Rule 7.011(m), an officer may receive permission from his physician and the office of the Chief of Police to leave his residence for therapeutic exercise. The record indicates that while on an extended sick leave in 1983, Buckner himself received generalized permission to leave his home to take care of his personal business. Until presented with a situation indicating otherwise, we are confident the Chief of Police and the medical division will allow injured officers whose physical condition permits it to leave their homes for therapeutic exercise and personal business when they so request.
 
 
 18
 We have no doubt that requiring officers to remain in their homes while on sick leave is rationally related to the St. Louis Police Department's legitimate interests in speeding the recuperation of its officers, maintaining discipline and morale, and preventing abuses of the department's liberal sick leave policy. Appellants' claim that the sick leave regulations violate their constitutional rights fails because they have not shown the absence of a rational relationship between the regulations and the important public interests they are designed to serve.
 
 III.
 
 19
 Crain alleges that he was fired in retaliation for exercising his right of free speech, a violation of his First and Fourteenth Amendment rights. The parties stipulated that the speech that forms the basis for this claim is Crain's written grievance of February 1, 1984, regarding the restrictive sick leave regulations, his written complaint to Sergeant Reynolds on December 6, 1983, alleging that a particular superior officer disciplined black officers more severely than white officers, and certain statements made by Crain at his September 12, 1985, hearing concerning his violation of the sick leave policy.
 
 
 20
 The threshold inquiry in considering Crain's claim is whether his expressions, uttered as they were in the context of his employment as a police officer of the City of St. Louis, were protected under the First Amendment. Roberts v. Van Buren Pub. Schools, 773 F.2d 949, 953 (8th Cir.1985). In making this determination we of course recognize that all non-obscene speech is protected to some degree by the First Amendment. The First Amendment, however, does not protect public employees from discipline for speech-related activities in a manner not afforded to employees in the private sector. The Supreme Court has stated:
 
 
 21
 [W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.
 
 
 22
 Connick v. Myers, 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). The determination of what speech is protected in the public employment context involves a two-step analysis: first, the speech must address a matter of public concern, 461 U.S. at 143, 103 S.Ct. at 1688, and then the interest of the employee in speaking must be weighed against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568, 88 S.Ct. at 1734. What speech is protected is a question of law not fact, Connick, 461 U.S. at 148 n. 7, 103 S.Ct. at 1690 n. 7, and in our determination of whether particular speech addresses a matter of public concern we consider "the content, form, and context of a given statement, as revealed by the whole record." 461 U.S. at 147-48, 103 S.Ct. at 1690.
 
 
 23
 In Connick, the Supreme Court held that questions concerning office transfer policy, office morale, the need for a grievance committee, and the level of confidence in supervisors, contained in a questionnaire distributed by an assistant district attorney to other assistant district attorneys in her office, did not address a matter of public concern. The Court rejected the argument that the questions were of public concern because they attacked the competency of the District Attorney as an elected official, holding instead that the "questions reflect one employee's dissatisfaction with a transfer and an attempt to turn that displeasure into a cause celebre." 461 U.S. at 148, 103 S.Ct. at 1691. A similar conclusion is appropriate with regard to Crain's written grievance and oral statements complaining of the Police Board's sick leave regulations. These statements did not touch upon a matter of public concern; they attacked an internal management decision made by the Police Board. Crain argues that his criticisms involved "matters of significance to his own family and all relatives of city police officers." Appellants' Brief at 21. Although this may be true, it does not serve to convert his personal grievances into a matter of public concern. Any management decision, e.g., the size of a salary increase or the number of company holidays, affects the employees and their families; this is decidedly not the proper test for determining what speech implicates a matter of public concern. We conclude that Crain's complaints regarding the Police Board's sick leave policy were merely personal grievances attacking internal departmental policy and accordingly did not involve protected speech.
 
 
 24
 Because Crain's written complaint to Sergeant Reynolds alleging racial discrimination by a superior officer does involve a matter of public concern, see Connick, 461 U.S. at 146, 103 S.Ct. at 1689, we must apply the Pickering balance, weighing Crain's interest in speaking against the Police Board's interest in promoting the effective and efficient fulfillment of its duties to the public. See Pickering, 391 U.S. at 568, 88 S.Ct. at 1734. "More so than the typical government employer, the [Missouri Highway] Patrol has a significant government interest in regulating the speech activities of its officers in order 'to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence in the law enforcement institution.' " Hughes, 714 F.2d at 1419 (quoting Gasparinetti v. Kerr, 568 F.2d 311, 315-16 (3rd Cir.1977)), cert. denied, 436 U.S. 903, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978). In Hughes, this Court held that an officer's speech-related activities, including accusations that a superior officer's son was involved in drug trafficking and allegations that another superior officer was involved in a ticket-fixing incident and a cover-up of an incident of prisoner abuse, were not "of such public and social importance as to override the Patrol's substantial interest in maintaining troop morale." 714 F.2d at 1421. Similarly, in Connick, where one of the assistant district attorney's questions implicated a matter of public concern by asking whether her fellow employees felt pressured by superiors to work on political campaigns, the Court stated that the limited sense in which this question touched on matters of public concern was easily outweighed by the district attorney's interest in maintaining authority and fostering close working relationships within his office. Connick, 461 U.S. at 154, 103 S.Ct. at 1693-94.
 
 
 25
 We believe the same analysis holds true in the instant case. Crain's complaint regarding racial discrimination is most accurately characterized as an individual employee grievance related to Crain's dissatisfaction at being charged with violating the sick leave regulations. The limited First Amendment interest implicated here is easily outweighed by the Police Board's interest in promulgating its sick leave regulations and maintaining discipline, morale, and good working relationships within the police department.
 
 
 26
 We conclude as a matter of law that the speech which forms the basis of Crain's retaliation claim was not protected by the First Amendment from disciplinary action and that the District Court properly granted summary judgment in favor of the Police Board on this claim.
 
 IV.
 
 27
 In his final claim, Crain argues that his discharge from the St. Louis Police Department violated his due process rights under the Fourteenth Amendment. The District Court granted the Police Board's motion for summary judgment on this claim in the erroneous belief that St. Louis police officers do not have an identifiable property interest in continued employment. The parties now agree that Mo.Rev.Stat. Sec. 84.120 (1986), which provides that a patrolman shall "be subject to removal only for cause after a hearing by the boards," triggers the protections of the due process clause. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538-39, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985); Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Because the facts surrounding Crain's discharge are undisputed, the District Court's failure to consider Mo.Rev.Stat. Sec. 84.120 does not hinder our review of this claim.
 
 
 28
 Crain was formally charged with violating the sick leave regulations on May 14, 1984. On September 12, 1985, pursuant to department regulations, a Hearing Officer appointed by the Police Board held an evidentiary hearing on the charge at which Crain was represented by counsel and testified. Following the hearing, the Hearing Officer prepared Recommended Findings of Facts and Conclusions of Law, finding Crain guilty of the charged infraction. On February 14, 1986, the Police Board met to consider the recommended findings and conclusions of the Hearing Officer and to determine the appropriate disciplinary action. At this board meeting, Captain Harmon distributed a background sheet detailing Crain's disciplinary record as a police officer; stated that he did not consider Crain a good officer; and recommended that he be terminated. As was the custom in such disciplinary meetings, Harmon did not include in his background sheet two letters of commendation Crain received five years earlier because the awards did not relate to the charge being considered by the Board. See Deposition of Captain Clarence Harmon at 35. After a discussion regarding punishment, the Police Board voted to discharge Crain. Crain argues that his due process rights were violated because he was not informed of the date of the Police Board meeting and was not afforded the opportunity to appear before the Board on that occasion. He claims essentially that the Police Board's decision-making meeting was a second evidentiary hearing at which he had the right to be present. We disagree.
 
 
 29
 In Loudermill, 470 U.S. 532, 105 S.Ct. 1487, the Supreme Court addressed the question of what process is due a public employee prior to discharge. The Court laid out the three essential requirements of due process: "The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." 470 U.S. at 546, 105 S.Ct. at 1495. In keeping with this standard, this Court has found violations of due process only when the discharged employee has been afforded no hearing or opportunity to present his version of the facts. See Runge v. Dove, 857 F.2d 469 (8th Cir.1988) (firing employee for dishonesty and violation of the rules violated due process because employer ignored employee when he first attempted to explain and gave him no opportunity later to present his story); Peery v. Brakke, 826 F.2d 740 (8th Cir.1987) (firing employee for seven specific incidents of poor performance violated due process when employee first was presented with list of incidents in notice of termination and was given no opportunity to explain or rebut the allegations).
 
 
 30
 In support of his position, Crain cites Navato v. Sletten, 560 F.2d 340 (8th Cir.1977), in which this Court held that a medical resident was denied due process in the course of his discharge from a medical residency training program when he was present at only one of two meetings at which allegations of misconduct were made. Navato clearly is distinguishable from the instant case. The Hearing Officer appointed by the Police Board held a single evidentiary hearing at which Crain, represented by counsel, had full opportunity to present his side of the case and at which all the evidence regarding Crain's alleged violation of the sick leave policy was presented. The background sheet that was distributed at the subsequent meeting of the Police Board detailing Crain's disciplinary record and Captain Harmon's recommendation to the Board that, based on this record, Crain ought to be discharged cannot be characterized as new evidence to which Crain must be allowed to respond. Crain's prior disciplinary problems were not allegations but facts that Crain must have known the Police Board would consider in arriving at its decision.[7] The fact that the background sheet listed only Crain's prior disciplinary episodes and not the more positive, although somewhat outdated, aspects of his career does not constitute a violation of due process. The Police Board is not constitutionally required to consider an officer's entire personnel file before taking appropriate disciplinary action. The ultimate reason for Crain's discharge were his violation of the sick leave regulations together with his having been absent without leave, and he was given ample opportunity to respond to each of those charges.
 
 
 31
 Crain thus was afforded the due process requirements named in Loudermill and more. He was given a formal hearing at which he was able to testify, confront the witnesses against him, and present, with the assistance of counsel, his factual defense and his argument that the sick leave regulations are unconstitutional. This hearing provided a more than adequate "initial check against mistaken decisions" as required by Loudermill, 470 U.S. at 545, 105 S.Ct. at 1495. That the Police Board's decision to discharge Crain was made at a later date after considering the findings and conclusions of the Hearing Officer, Crain's record, and Captain Harmon's recommendation does not serve to make his discharge unconstitutional. See Riggins v. Board of Regents, 790 F.2d 707 (8th Cir.1986) (due process was satisfied when employer met with employee and heard her account of incident, two days later met with employee's supervisors, and then determined employee was not being truthful and should be fired). In the public employment context, due process does not require that an employee be present at his "sentencing" when an adverse employment decision is made. We conclude that the pretermination hearing before the Hearing Officer afforded Crain all the process that was due and that his discharge from the St. Louis Police Department did not violate his constitutional rights.
 
 V.
 
 32
 For the reasons discussed above, we hold that the St. Louis Police Department's sick leave regulations challenged by Crain and Buckner are not unconstitutional and that Crain's individual challenges to his discharge afford him no basis for relief. The District Court's entry of summary judgment in favor of defendants is affirmed.
 
 
 33
 JOHN R. GIBSON, Circuit Judge, concurring in part and dissenting in part.
 
 
 34
 I concur in most of the court's opinion, but dissent from part IV of the opinion, holding that Crain's due process rights under the fourteenth amendment were not violated by failure to provide a hearing on the extent of discipline. I have no quarrel with the propriety of the board's determination that Crain violated the rules and should be disciplined. My concern is with whether the procedure for setting his punishment was constitutionally adequate. Crain was allowed no participation in the proceedings to determine his punishment, and on this issue Crain was faced with a stacked deck.
 
 
 35
 The hearing officer filed recommended findings of fact and conclusions of law concerning guilt of the infraction, but made no recommendation concerning the appropriate punishment. When the board met, Captain Harmon distributed a background sheet concerning Crain's disciplinary record that contained all of the negative comments, but no information concerning the commendations. The majority states that the police board was not "constitutionally required to consider an officer's entire personnel file," at 1413, but the fact is that the board was required by agency procedures to review Crain's overall record. The police department's manual provided that "in assessing discipline the Board may review and take into consideration the accused's service record ... and the Board shall make said service record a part of the official record and transcript of the hearing and shall certify to same."[8] Police Manual at 68 (J.A. at 144). Significantly, members of the board testified in depositions that they thought the material provided by Captain Harmon would have included meritorious behavior, had it existed. Dep. of James Mosbacher at 36-37 (J.A. 174-75); Dep. of William Henry Young at 20 (J.A. 182).
 
 
 36
 In spite of the marked tilting of the playing field at this point, Crain had no opportunity to appear before the board and present his argument concerning the extent of discipline that should be imposed upon him.
 
 
 37
 The proceedings in this case were bifurcated into guilt and punishment phases, and Crain was given no opportunity to argue his case on the punishment phase. The Supreme Court recognized in Loudermill that a public employee has an interest in being heard on the subject of his punishment as well as that of his guilt: "Even where the facts are clear, the appropriateness or necessity of the discharge may not be; in such cases, the only meaningful opportunity to invoke the discretion of the decisionmaker is likely to be before the termination takes effect." 470 U.S. at 543, 105 S.Ct. at 1494. The importance of an employee's participation in determining his punishment was also recognized in Kelly v. Smith, 764 F.2d 1412 (11th Cir.1985), in which the court held a public employee's right to a post-termination hearing was not satisfied, in part because he had not been allowed "to present witnesses to support his claim that termination was too severe a punishment." Id. at 1415.[9]
 
 
 38
 Here, the decisionmakers were permitted to see only a truncated, misleading service record, an omission which Crain would certainly have corrected, had he been allowed to participate. Though there is no evidence of improper motive, the department's actions skewed the evidence against Crain, and I consider this analogous to a case in which the agency purposefully suppressed evidence. Cf. Detweiler v. Virginia Dep't of Rehabilitative Services, 705 F.2d 557, 561-62 (4th Cir.1983) (witnesses intimidated). In light of the fact that Crain had no opportunity to respond to the proposed penalty of discharge, I conclude that Crain's due process rights were violated. I would reverse and remand on this issue.
 
 
 
 [1]
 The Honorable Clyde S. Cahill, United States District Judge for the Eastern District of Missouri
 
 
 [2]
 The District Court denied the Police Board's motion for summary judgment on Crain's fourth claim, which alleged racial discrimination on the part of the Police Board in violation of 42 U.S.C. Sec. 1981 (1982) and the Equal Protection Clause. Crain subsequently dismissed this claim voluntarily and it is not a subject of this appeal
 
 
 [3]
 The Police Board argued in its motion for summary judgment that Crain did not have standing to challenge the sick leave regulations but does not raise the argument on appeal. Because standing and mootness are jurisdictional issues, this Court has a duty to address these issues even if the parties do not. See Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 475-76, 102 S.Ct. 752, 760-61, 70 L.Ed.2d 700 (1982) ("Those who do not possess Art. III standing may not litigate as suitors in the courts of the United States.")
 
 
 [4]
 Police Manual Rule 7.011(m) provides in pertinent part:
 
 
 [7]
 011 Standards of Conduct--A member of the Department shall be subject to disciplinary action for the violation of the rules of conduct set forth by the Department as herein, for the violation of other rules and regulations set out in the Manual, for the violation of Special Orders, and for violation of the orders of a superior officer
 Acts contrary to good conduct shall include, but not be limited to the following:
 (m) Reporting sick or injured without notifying one's commanding or acting commanding officer prior to the appointed time for his report for duty; or, leaving his residence or place of confinement while on the sick list except to obtain medical treatment or attention or at the direction of the attending physician for the express purpose of therapeutic exercise and after approval from the office of the Chief of Police. (See Form MPD MED-3: Recommendation for Limited Duty or Rehabilitation Activity.)
 Special Order 71-S-1, section II, paragraph 4 similarly forbids police officers from leaving their homes for non-medical reasons while they are convalescing on sick leave. The Order states:
 A member of the Department reporting sick or injured shall not leave his residence or place of confinement except for the purpose of obtaining medical attention or treatment. Each member of the Department who shall be removed from his residence to a hospital or other place for treatment shall cause notification at such removal to be communicated to his bureau, district or division, with the address of the hospital or other place and shall report in the same manner, when he leaves the hospital or place for treatment.
 
 
 [5]
 The Police Board maintains that as a general practice police officers on sick leave were able to obtain permission to leave their homes by telephoning the dispatcher and informing him of where they were going and then telephoning again when they returned home. There is testimony in the depositions submitted to the District Court indicating that several supervisors followed the practice of not citing for violations of the sick leave policy those officers who obtained this type of telephonic leave. This informal practice, however, is not contained in the Police Manual or in any special order of the department and there is no indication in the record as to how the officers were informed of this practice or whether all supervisors followed it. Accordingly, we will determine the constitutionality of the sick leave regulations without considering the impact, if any, of the telephonic leave practice on this determination. While allegations that telephonic leave was granted in an arbitrary or discriminatory manner might state an Equal Protection claim or a violation of 42 U.S.C. Sec. 1981, appellant has not raised this issue and we express no opinion on it
 
 
 [6]
 Following the reasoning of Kelley, this Court has held that, while a school board's hair length regulations infringe upon male students' right to wear their hair as they choose, similar hair length regulations do not violate the rights of police officers or park naturalists in the public park system so long as the state articulates a rational, nonarbitrary reason for the restrictions. See Lowman v. Davies, 704 F.2d 1044 (8th Cir.1983) (park naturalists); Stradley v. Andersen, 478 F.2d 188 (8th Cir.1973) (police officers); Bishop v. Colaw, 450 F.2d 1069 (8th Cir.1971) (students)
 
 
 [7]
 Police Manual Rule 7.019 specifically provides that "in assessing discipline the Board may review and take into consideration the accused's service record and the proceedings in former hearings."
 
 
 [8]
 Mo.Rev.Stat. Sec. 536.080 (1986) provides:
 In contested cases, each official of an agency who renders or joins in rendering a final decision shall, prior to such decision, either hear all the evidence, read the full record including all the evidence, or personally consider the portions of the record cited or referred to in the arguments or briefs. The parties to a contested case may by written stipulation or by oral stipulation in the record at a hearing waive compliance with the provisions of this section.
 
 
 [9]
 Though Crain complains of deficiencies in a pre-termination hearing rather than a post-termination hearing, the Board's decision at the pre-termination hearing was final, Police Manual at 69 (J.A. 145), and therefore Crain had no further opportunity to present evidence at the administrative level. Mo.Rev.Stat. Sec. 536.100 (1988) entitled him to judicial review "limited to a determination of whether the [administrative decision] is supported by competent and substantial evidence upon the whole record, whether it was arbitrary, capricious or unreasonable, or whether the [agency] abused its discretion." Jarrett v. Hill, 648 S.W.2d 170, 172 (Mo.Ct.App.1983) (citations omitted), quoted in Curry v. St. Louis County, 773 S.W.2d 499, 501 (Mo.Ct.App.1989) (policeman termination case). Thus, like the employee in Kelly v. Smith, Crain had no opportunity to be heard on the punishment issue